UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SALVADOR VALDEZ,

        Plaintiff,                            Civil Action No. 2:12-cv-13215

        v.                                 District Judge Victoria A. Roberts
                                              Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

        Defendant.
_____/

**REPORT AND RECOMMENDATION TO
DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [8] AND
GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [9]**

        This is a social-security appeal. Plaintiff Salvador Valdez started working as a forklift driver in 1985. (Tr. 121.) In 2004, he was hit from behind by another forklift. (Tr. 200.) Valdez was thrown upwards and hit his head on the forklift's cage. (Tr. 316.) He lost consciousness, and, when he awoke, he was dazed and confused. (*Id.*) Valdez asserts that he has experienced neck and/or back pain, along with migraine headaches, since that time. (*See* Tr. 33, 197, 200-01, 208, 316.) Nonetheless, Valdez continued to work, albeit performing less physically demanding tasks, until 2007. (Tr. 40.) In 2009, at age 44, he applied for disability benefits. (Tr. 102.) The Defendant Commissioner of Social Security denied Valdez's application. (Tr. 1.) Valdez now appeals. (Dkt. 1, Compl.)

        Before the Court for a report and recommendation (Dkt. 2) are the parties' cross-motions for summary judgment (Dkts. 8, 9). As detailed below, Plaintiff has not shown that the Administrative Law Judge committed reversible error in evaluating the opinion evidence of record or in deciding

not to fully credit his testimony about his impairments. The Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 8) be DENIED, that Defendant's Motion for Summary Judgment (Dkt. 9) be GRANTED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be AFFIRMED.

## I. BACKGROUND

### A. Procedural History

In June 2009, Valdez applied for period of disability and disability insurance benefits asserting that he became unable to work on February 15, 2007. (Tr. 12.) The Social Security Administration initially denied his application in September 2009. (Tr. 12.) Valdez then requested an administrative hearing, and on September 30, 2010, he appeared with counsel before Administrative Law Judge ("ALJ") Regina Sobrino, who considered his case *de novo*. (*See* Tr. 29-50.) In a January 24, 2011 decision, the ALJ found that Valdez was not disabled within the meaning of the Social Security Act. (*See* Tr. 12-20.) The ALJ's decision became the final decision of the Commissioner of Social Security ("Commissioner") on June 4, 2012, when the Social Security Administration's Appeals Council denied Valdez's request for review. (Tr. 1.) Valdez filed this suit on July 23, 2012. (Dkt. 1, Compl.)

### B. Medical Evidence

*1. Medical Evidence of Valdez's Physical Condition Prior to the Alleged Disability Onset Date*

The first treatment note in the record is from May 2004. (Tr. 200.) On that date, Valdez saw Dr. Jeffery Levin, a neurologist. (*Id.*) Valdez reported that since the forklift accident, he had been suffering pressure headaches two to three times per week; the headaches sometimes caused nausea and vomiting. (*Id.*) Upon examination, Dr. Levin noted that Valdez had muscle spasm in his cervical

spine, weakness in his thumb, positive "Tinel's" and "Phalen's" signs (tests for carpal tunnel syndrome), and leg pain during a straight-leg raising test. (*Id.*) Dr. Levin diagnosed post-concussion cephalgia, bilateral carpal-tunnel syndrome, cervical strain, and lumbar radiculopathy. (Tr. 201.) Dr. Levin noted that the prescribed medications, Vicodin and Soma, had not been effective; he instead prescribed Motrin and a host of other medications. (*Id.*)

In November 2004, Valdez returned to Dr. Levin with complaints of headaches, dizziness, ringing in his ears, and back spasm. (Tr. 197.) Dr. Levin noted that an EEG showed "slowing of the background activity consistent with a closed head injury" and that MRIs showed a disc herniation in Valdez's lumbar spine and narrowing of the cervical-spine neural foramen (passages where spinal nerves exit the vertebrae). (*Id.*) Dr. Levin noted, however, that Valdez's headaches had responded to Naprosyn; he additionally prescribed Phenergan for that condition. (*Id.*)

Valdez apparently treated with "Dr. Vincent" in 2005; the corresponding records, however, are absent from the administrative record. (*See* Tr. 194.)

During 2006, Valdez's symptoms remained largely constant. In January, Dr. Levin again noted thenar weakness and positive Tinel's and Phalen's. (*Id.*) Valdez's gait was antalgic and he had leg pain upon straight leg raising. (*Id.*) In May, Dr. Levin again found positive Tinel's and Phalen's, cervical muscle spasms, and lower extremity pain upon straight-leg raising. (*Id.*) In August: "[Mr. Valdez's] exam is unchanged." (Tr. 191.) It appears that Valdez stopped working in September 2006. (Tr. 187.) In December 2006, Dr. Levin's exam findings were again similar, but he also noted that Valdez's existing "cognitive problems" and "difficulty spelling" had become "somewhat" worse recently. (Tr. 188.) Valdez was then taking Phenergan for his headaches, Remeron (an antidepressant), and Flexeril (a muscle relaxant). (*Id.*)

3

During a January 2007 physical-therapy evaluation, Valdez reported that his lower back and left buttock pain ranged from zero- to seven-out-of-ten. (*Id.*) Valdez's lumbar flexion was 50% of normal, and his lumbar extension only 75%. (Tr. 249.)

Following the exam, Dr. Yamini Ramalingam, a family medicine practitioner, provided that Valdez should not work until February 1, 2007. (Tr. 235.)

> *2. Medical Evidence of Valdez's Physical Condition After the Alleged Disability Onset Date*

In April 2007, Valdez returned to Dr. Levin (his neurologist). (Tr. 187.) Dr. Levin found that Valdez continued to exhibit thenar weakness, positive Tinel's and Phalen's, pain on straight-leg raising, an antalgic gait, and decreased sensation in the L5 distribution in both legs. (Tr. 187.) Valdez was less anxious, however, and his speech was "fluent" and "non-dysarthic" (not slurred). (*Id.*)

The next month, Valdez saw Dr. Ramalingam for a follow-up. (Tr. 291.) Upon reviewing an x-ray from January 2007, Dr. Ramalingam noted that it showed "old fractures" of the transverse process of three lumbar vertebrae and moderate degenerative joint disease at L4-L5 and L5-S1. (*Id.*) Valdez was instructed to continue taking analgesics and muscle relaxants and to start physical therapy. (*Id.*) Valdez only attended two physical therapy sessions prior to being discharged. (Tr. 242.)

In August and November 2007, Valdez returned to Dr. Levin. (Tr. 183, 186.) The findings were similar at both exams and to those from earlier: cervical muscle spasm, thenar weakness, positive Tinel's and Phalen's, pain on straight-leg raising, antalgic gait, and decreased sensation in the L5 distribution in both legs. (Tr. 183; *see also* Tr. 186.)

Valdez had an exacerbation of back pain in December 2007. (Tr. 271; *see also id.* Tr. 241.)

In January 2008, he told Dr. Ramalingam that the pain radiated to both legs and caused his left toes to go numb. (Tr. 271.) Sitting made the pain worse, but standing and lying down on his stomach helped. (*Id.*) Two days after his visit with Dr. Ramalingam, Valdez underwent another evaluation for physical therapy. (Tr. 237-41.) Valdez reported pain ranging from six- to eight-out-of-ten and the therapist noted that Valdez had lost 75% of his ability to flex his lumbar spine, and 90% of his ability to extend it. (Tr. 241.)

In March 2008, Dr. Gavin Awerbuch performed a consultative exam for Michigan's Disability Determination Service. (Tr. 310-17.) Valdez reported that his chronic back pain radiated to his legs and numbness in his feet and legs. (Tr. 316.) Consistent with Valdez's complaints, Dr. Awerbuch noted "EMGs confirming bilateral radiculopathy." (*Id.*) Valdez also reported neck pain and stiffness that radiated to his shoulders. (*Id.*) He told Dr. Awerbuch that he had headaches three to four times per week that caused nausea and required him to lie down in the dark for several hours. (*Id.*) Valdez said that since the forklift accident, he has experienced trouble with balance, memory loss, and difficulty concentrating and focusing. (*Id.*) Valdez told Dr. Awerbuch that he needed to take Ritalin to help his attention span. (*Id.*) On exam, Dr. Awerbuch found that Valdez had positive Tinel's and Phalen's, that his fine movements were "clumsy," that he could not walk on his heels or toes, and that Valdez had difficulty with retention and recall. (Tr. 317.) Dr. Awerbuch diagnosed postconcussional syndrome, posttraumatic migraine headaches, posttraumatic neck and back pain, cervical and lumbar disc disease with radiculopathy, and bilateral carpal tunnel syndrome. (*Id.*) Functionally, Dr. Awerbuch believed that Valdez could not sit or stand for more than 10 to 15 minutes and could lift less than 10 pounds occasionally. (Tr. 312.)

In the Fall of 2008, Valdez told Dr. Ramalingam that his back pain was activity dependent.

5

(Tr. 269.) Dr. Ramalingam noted, "He wants diet pills to lose weight, although he works out regularly, including working with weights." (*Id.*) At a "Well-Male Exam" Dr. Ramalingam diagnosed Valdez with plantar fasciitis of the left foot, anxiety, and situational depression. (Tr. 293-94.)

In January 2009, Dr. Neil Friedman reviewed Dr. Awerbuch's consultative report and some of Dr. Levin's treatment notes and then performed another consultative exam for Michigan's DDS. (Tr. 202-09.) Dr. Friedman found that Valdez's cervical range of motion was not limited and that Valdez walked with a normal gait. (*Id.*) When attempting to squat, however, Valdez reported pain at only 10 degrees of knee flexion. (*Id.*) Valdez's lumbosacral flexion was "self restricted" to 10 degrees. (*Id.*) When asked if he could walk on his heels or toes, Valdez answered "no" without attempting the activity. (*Id.*) Dr. Friedman questioned the alleged cause of Valdez's symptoms:

> Although Mr. Valdez attributes his current symptomatology to a reported work incident which he states occurred in March 2004, I previously evaluated the claimant for an independent medical examination October 20, 2003, approximately six months prior to his reported work incident. At that time he presented with virtually identical symptomatology including "migraine" headache as well as low back pain with sharp pain radiating down the legs. He attributed his symptomatology to a motor vehicle accident which had occurred October 1, 2001.

(Tr. 208.) Dr. Friedman concluded, "Based upon today's examination, the claimant should be able to work eight hours/day without restriction. I do not detect any clinical evidence of functional impairment or disability from a neuro-musculoskeletal perspective." (*Id.*)

In August 2009, Dr. R. Scott Lazzara completed a third consultative exam for Michigan's DDS. (Tr. 211-17.) He found that Valdez's range of motion in his cervical and lumbar spine were normal. (Tr. 214-15.) Valdez had no problem heel or toe walking and had only mild difficulty

squatting. (Tr. 214.) Although Dr. Lazzara focused on Valdez's physical condition, he noted that Valdez's "immediate, recent and remote memory [was] intact with normal concentration." (*Id.*) Dr. Lazzara concluded that Valdez suffered from headaches and back pain much of which appeared to be "myofascial due to whiplash injury." (Tr. 216.) He continued,

> At this point, continued supportive care would be indicated. He does appear to have an element of deconditioning and motivation also does appear to be playing a role. His long-term prognosis is fair. He is not actively deteriorating.

(Tr. 216.)

In October 2009, Valdez returned to Dr. Ramalingam for the first time in nearly a year. (Tr. 266.) Valdez complained of diffuse joint aches and pains, shoulder pain, and low back pain. (*Id.*) Dr. Ramalingam believed that Valdez probably had a rotator cuff strain and therefore limited Valdez to a 15-pound lift limit. (*Id.*)

*3. State DDS Evaluations of Valdez's Mental or Emotional Impairments*

Valdez also underwent a psychological exam at the request of the Social Security Administration. In March 2008, Valdez was evaluated by limited license psychologist Carrie Neubecker, Psy.D. (Tr. 308.) Dr. Neubecker concluded,

> It was my impression that [Mr. Valdez's] psychological condition would mildly impair his ability to perform work related activities. There was no significant evidence of cognitive problems during the evaluation. Although [Mr. Valdez] reports memory and focusing problems, he was under-representing his abilities today. Because of this, I was unable to confirm any cognitive difficulties. Psychological testing would be beneficial to further assess his level of functioning; however it is likely that he would also under-represent his abilities during testing as well.

(Tr. 308.)

Shortly after Dr. Neubecker completed her exam, Dr. Ashok Kaul completed a Psychiatric

Review Technique Form ("PRTF"). (Tr. 318-31.) He opined that Valdez's depressive disorder was not severe. (Tr. 318, 321.) In rating the paragraph "B" criteria associated with the Social Security Administration's mental-impairment listings, Dr. Kaul provided that Valdez had "mild" limitations in concentration, persistence, or pace, but was not otherwise limited. (Tr. 328.)

Dr. Syd Joseph completed another PRTF in January 2009. (Tr. 354-67.) Like Dr. Kaul, Dr. Joseph believed that Valdez's depression was not severe. (Tr. 354-57.) And he rated the "B" criteria only slightly differently than Dr. Kaul: Dr. Joseph believed that Valdez had "mild" limitations in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. (Tr. 364.)

### C. Testimony at the Hearing Before the ALJ

At his administrative hearing before ALJ Sobrino, Valdez primarily testified about his functional limitations. He said he could stand and walk for only 15 or 20 minutes. (Tr. 34.) He told the ALJ that he could sit for "25 minutes, maybe" in an office-type chair. (*Id.*) Lifting, according to Valdez, was limited to five or ten pounds. (Tr. 35.) Valdez testified that when he got a migraine, he had to lie down in a dark room for about five hours. (Tr. 41.) When asked how many days out of the month he needed to do this, Valdez replied, "[p]robably about half the month." (*Id.*)

When the ALJ asked about Dr. Ramalingam's note about weight lifting, Valdez explained, "Well, I told her I wanted to get back, because I used to lift weights a long time ago, and I told her I'd like to get back, but I wanted to go through the therapy. I wanted to get therapy first. And then go see what happens, and I never started working out, because I couldn't deal with my back." (Tr. 39.)

The ALJ also solicited testimony from a vocational expert to determine whether jobs would

be available for someone with functional limitations that the ALJ believed approximated Valdez's. In particular, the ALJ asked the expert about job availability for a hypothetical individual of Valdez's age (45 years old), education (high school), and work experience who could lift, carry, and push and pull five pounds "frequently" and 10 pounds "occasionally"; could stand for two hours in an eight-hour day; needed to alternate between sitting and standing "for up to five minutes approximately every 15 minutes"; could not climb ladders or stairs; could not kneel, crouch, or crawl; was limited to "frequent" handling, fingering, and feeling; could not reach above shoulder level; could not be exposed to hazards or vibration; and was limited to simple, repetitive, routine, low stress work not involving "intense interpersonal confrontations" or "high quotas." (Tr. 44-45.)

The VE testified that there would be a number of jobs this hypothetical individual could perform: administrative support work, information clerk, machine operator, stock handler and packager, and bench assembler. (Tr. 46.) The VE said that, in total, there were thousands of these jobs in Michigan's lower peninsula. (*See Id.*)

## II. THE ALJ'S APPLICATION OF THE DISABILITY FRAMEWORK

Under the Social Security Act (the "Act"), disability insurance benefits and supplemental security income "are available only for those who have a 'disability.'" *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505 (DIB); 20 C.F.R. § 416.905 (SSI).

The Social Security regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> 1. If claimant is doing substantial gainful activity, he is not disabled.
>
> 2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.
>
> 3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.
>
> 4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.
>
> 5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997); *see also* 20 C.F.R. §§ 404.1520, 416.920. "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

At step one, ALJ Sobrino found that Valdez had not engaged in substantial gainful activity since the alleged disability onset date of February 15, 2007. (Tr. 14.) At step two, she found that Valdez had the following severe impairments: degenerative disc disease, carpal tunnel syndrome, anxiety, and post-concussion syndrome. (*Id.*) Next, the ALJ concluded that none of these impairments, alone or in combination, met or medically equaled a listed impairment. (Tr. 14-15.) Between steps three and four, the ALJ determined that Valdez had the residual functional capacity to:

> perform sedentary work as defined in 20 CFR 404.1567(a), with the following additional limitations: he should have the opportunity to alternate position for up to 5 minutes, approximately every 15

>   minutes; no climbing ladders or stairs; occasional balancing and stooping; no kneeling, crouching or crawling; frequent handling, fingering and feeling; no reaching above shoulder level and no more than occasional reaching in other directions with the non-dominant arm; no use of foot or leg controls; no exposure to hazards or vibration; and no driving as a work duty[;] the claimant is limited to performing simple, repetitive, routine, low stress work that does not involve intense interpersonal confrontations or high quotas.

(Tr. 15.) At step four, the ALJ found that Plaintiff was unable to perform any past relevant work. (Tr. 19.) At step five, the ALJ found that sufficient jobs existed in the national economy for someone of Plaintiff's age, education, work experience, and residual functional capacity. (Tr. 19-20.) She therefore concluded that Plaintiff was not disabled as defined by the Social Security Act from the alleged onset date through the date of her decision, January 24, 2011. (Tr. 20.)

## III. STANDARD OF REVIEW

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited: the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted).

Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th

Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider that record as a whole. *Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *Rogers*, 486 F.3d at 247.

## IV. ANALYSIS

The Court begins with Plaintiff's underdeveloped treating-source argument. Plaintiff recites the treating-source rule and accompanying law, but makes no effort to apply that law to this case. (*See* Pl.'s Mot. Summ. J. at 12-14.) In any event, the Court finds that the ALJ did not violate the treating-source rule or otherwise reversibly err in evaluating the opinion evidence.

Dr. Ramalingam, a possible treating source, limited Plaintiff to lifting no more than 15 pounds. But this is not inconsistent with the lifting limitations the ALJ imposed. (*Compare* Tr. 15, *with* Tr. 266.) Plaintiff points to Dr. Ramalingam's note that Plaintiff was "dependent on Xanax" to support his claim that he suffers from severe anxiety. (*See* Pl.'s Mot. Summ. J. at 11 (citing Tr.

266).) But Dr. Ramalingam's statement was made in the context of Plaintiff's insomnia, not his anxiety. (Tr. 266.) Regarding the latter, Dr. Ramalingam stated that Plaintiff was to take Xanax *pro re nata*, i.e., as needed. (*Id.*) Further, Dr. Ramalingam did not see the need to refer Plaintiff for psychological treatment. (*See id.*) Additionally, the Court notes the several state-examining evaluations finding that Plaintiff's mental impairments were mild or not significant. (Tr. 308, 328, 364.)

As for Dr. Levin, another possible treating source, Plaintiff suggests that the ALJ should have credited his December 2006 statement that he had "'some cognitive problems with memory and difficulty spelling, somewhat worse recently.'" (Pl.'s Mot. Summ. J. at 11 (quoting Tr. 188).) But Dr. Levin's recording of Plaintiff's subjective complaint is not a "medical opinion" entitled to any special deference. *See* 20 C.F.R. § 404.1527(a)(2) ("Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."); *Poe v. Comm'r Soc. Sec.*, 342 Fed. App'x 149, 156 (6th Cir. 2009). Further, based on this Court's review of the record, there are no subsequent reports to Dr. Levin (or Dr. Ramalingam) about memory, spelling, or other similar cognitive difficulties. Given the absence of evidence of significant cognitive impairment during the disability period, the Court finds no error in the ALJ's failure to credit Dr. Levin's pre-onset date statement.

Plaintiff also implies that the ALJ erred by not crediting Dr. Awerbuch's opinion; in particular, Plaintiff highlights Dr. Awerbuch's conclusion that Plaintiff had "significant" neurological abnormalities and difficulty "even in daily activities." (Pl.'s Mot. Summ. J. at 11

13

(quoting Tr. 317).)

It is true that the ALJ did not explicitly discuss Dr. Awerbuch's opinion. But even assuming that this was error, remand is not warranted. For one, the explanatory requirement of the treating-source rule did not apply to Dr. Awerbuch's "examining" opinion. *See Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007) ("[E]ven if the purpose of the reasons-giving requirement in § 404.1527[(c)](2) applies to the entire regulation, the SSA requires ALJs to give reasons for only *treating* sources.").

For another, the ALJ provided an adequate implicit attack on Dr. Awerbuch's opinion through his discussion of Dr. Friedman's and Dr. Lazzara's findings. Specifically, she quoted the following from Dr. Friedman's opinion: "'the claimant should be able to work eight hours/day without restriction. I do not detect any clinical evidence of functional impairment or disability from a neuro-musculoskeletal perspective.'" (Tr. 18 (citing Tr. 208).) This statement is plainly contrary to Dr. Awerbuch's opinion. The ALJ also accurately noted that Dr. Lazzara found that "claimant had no difficulty getting on or off the examination table, no difficulty heel and toe walking, mild difficulty squatting and mild difficulty hopping" and that Plaintiff had a "normal range of dorsolumbar spine motion." (Tr. 18 (citing Tr. 214-15).) This too is contrary to Dr. Awerbuch's findings; he found that Plaintiff could not walk on his heels or toes and had a reduced range of motion in his lumbar spine. (*See* Tr. 314, 317.) By discussing the findings of Drs. Friedman and Lazzara that support her residual functional capacity assessment, and by omitting a comparable discussion of Dr. Awerbuch's contrary opinion, the Court believes that the ALJ intended to, and did, credit Drs. Friedman and Lazzara over Dr. Awerbuch.

Further, this implicit attack was reasonable. Dr. Awerbuch, like Dr. Friedman, was only an

14

examining physician. They both were specialists in areas relevant to Plaintiff's impairments: Dr. Awerbuch in neurology, Dr. Friedman in physical medicine and rehabilitation and electrodiagnostic medicine. (*Compare* Tr. 317, *with* Tr. 373.) Dr. Friedman had slightly greater familiarity with Plaintiff given that he had examined Plaintiff on two occasions. (Tr. 375.) Dr. Friedman also had the benefit of reviewing Dr. Awerbuch's findings. (Tr. 375.) Further, as explained, Dr. Lazzara's findings were more in accord with Dr. Friedman's than Dr. Awerbuch's. Thus, the ALJ had good reasons for crediting Dr. Friedman's opinion over Dr. Awerbuch's.

Remaining is Plaintiff's claim that the ALJ erred in evaluating his credibility.

An ALJ's credibility assessment proceeds in two steps. *Baranich v. Barnhart*, 128 F. App'x 481, 487 (6th Cir. 2005). First, the ALJ determines if the claimant suffers from a "medically determinable impairment[] that could reasonably be expected to produce [the claimant's] symptoms." 20 C.F.R. § 404.1529(c)(1); *Baranich*, 128 F. App'x at 487. If so, the ALJ then evaluates the "intensity and persistence" of the claimant's symptoms. 20 C.F.R. § 404.1529(c)(1). At this second step, the ALJ should not reject a claimant's "statements about the intensity and persistence of [his] pain or other symptoms or about the effect [his] symptoms have on [his] ability to work solely because the available objective medical evidence does not substantiate [the claimant's] statements." 20 C.F.R. § 404.1529(c)(2); *see also* S.S.R. 96-7p, 1996 WL 374186. To the contrary, the regulations list other considerations that should inform the ALJ's credibility assessment. 20 C.F.R. § 404.1529(c)(3). Although an ALJ need not explicitly discuss every factor, *Cross v. Comm'r of Soc. Sec.,* 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005), an ALJ's "decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the

weight the adjudicator gave to the individual's statements and the reasons for that weight," S.S.R. 96-7p, 1996 WL 374186 at *2.

Within the above framework, an ALJ's credibility analysis warrants considerable deference: a court is to accord an "ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which [a court does] not, of observing a witness's demeanor while testifying." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003); *see also Daniels v. Comm'r of Soc. Sec.*, 152 F. App'x 485, 488 (6th Cir. 2005) ("Claimants challenging the ALJ's credibility findings face an uphill battle."). Further, an ALJ's credibility analysis is subject to harmless error review. *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012) (citing *Carmickle v. Comm'r of Soc. Sec.*, 533 F.3d 1155, 1162 (9th Cir. 2008) with approval); *Carmickle*, 533 F.3d at 1162 ("So long as there remains substantial evidence supporting the ALJ's conclusions on credibility and the error does not negate the validity of the ALJ's ultimate credibility conclusion, such is deemed harmless and does not warrant reversal." (quotation marks omitted and punctuation altered)).

Plaintiff first argues that the ALJ should have credited his testimony about his degenerative disc disease; in particular, his statements that he could stand for only 15 or 20 minutes, sit for only 25 minutes, and lift five to ten pounds. (Pl.'s Mot. Summ. J. at 10.) In support, Plaintiff cites Dr. Levin's findings from November 2007: cervical muscle spasm, pain on a straight-leg-raising test, antalgic gait, and decreased sensation in both legs. (Pl.'s Mot. Summ. J. at 10 (citing Tr. 183).) He also cites a physical-therapy evaluation from January 2008 where he reported "cramps" in his lumbar muscles and worsening symptoms with activities like standing and walking. (*Id.* (citing Tr. 238).) Additionally, Plaintiff points to an August 2008 record where he reported that his back pain

16

was activity dependent. (*Id.* (citing Tr. 269).) Plaintiff further relies on a January 2007 x-ray revealing degenerative joint disease and "old fractures" of the transverse processes of the lumbar vertebrae. (*Id.* (citing Tr. 291).)

There is no question that this evidence lends support to Plaintiff's testimony about his limitations from his neck and back pain.

But the question for the Court is, taking the record as a whole, whether substantial evidence, which need not be a preponderance, *see Rogers*, 486 F.3d at 241, supports the ALJ's reasons for discounting that testimony. The Court believes that it does. First, save Dr. Awerbuch's opinion, none of the records Plaintiff cites in support of his neck and back pain provide functional limitations. That is, while the cited records clearly support Plaintiff's claim that he had back and neck pain, they do not provide much support for the limitations Plaintiff says arise from that pain. Second, and more significantly, Plaintiff overlooks the evidence cited by the ALJ that cuts against his testimony. For instance, the ALJ pointed out that Plaintiff had never been referred for back surgery and reasonably concluded that Plaintiff's course of treatment had been relatively conservative. (Tr. 18.) Indeed, at the same exam that Dr. Ramalingam noted "old fractures" in Plaintiff's vertebrae, his prescribed treatment consisted of pain medication, muscle relaxants, and physical therapy. (Tr. 291.) Additionally, Plaintiff ignores the findings of Drs. Friedman and Lazzara that support the ALJ's decision to discount Plaintiff's testimony. In all, the record pertaining to Plaintiff's neck and back pain is not so one-sided that substantial evidence fails to support the ALJ's decision to discount Plaintiff's statements about the functional limitations arising from that pain.

Plaintiff next asserts that the ALJ wrongly discredited his statements about his migraines. The Court disagrees. The ALJ reasoned as follows:

17

> Although the claimant testified that he currently experiences migraine headaches 15 days out of the month, this is not reflected in the medical record for the time period relevant to this decision. It was noted that the claimant had headaches following the injury in 2004, but there is no indication that the headaches persisted at the frequency alleged.

(Tr. 18.) This is an accurate statement. In particular, a review of Dr. Levin's and Dr. Ramalingam's treatment notes reveals very few reports of migraine headaches. Indeed, Plaintiff did not even see Dr. Levin or Dr. Ramalingam for almost an entire year of the disability period. (*See* Tr. 266, 269.) The ALJ's expectation of more frequent reports of migraines, with alterations in the course of treatment, was reasonable given Plaintiff's claim that he experienced migraines half the month for several hours each time. Because the record is not in accord with that reasonable expectation, it follows that the ALJ reasonably discounted Plaintiff's testimony about his migraines.

Plaintiff implies that the ALJ was wrong not to credit his statements about the side effects of his medication: "'[j]ust very tired all the time, can't concentrate. Foggy. Balance is bad. Weakness.'" (Pl.'s Mot. Summ. J. at 11 (quoting Tr. 38).) But even if these statements were credited, Plaintiff has not explained how they are inconsistent with the ALJ's residual functional capacity assessment. In particular, relevant to Plaintiff's balance problems, the ALJ eliminated stair and ladder climbing, exposure to hazards and vibration, and driving. (Tr. 15.) To account for Plaintiff's concentration and other cognitive difficulties, the ALJ limited Plaintiff to "simple, repetitive, routine, low stress work that does not involve intense interpersonal confrontations or high quotas." (Tr. 15.) It appears to this Court that these limitations account for the above statements. Plaintiff has not explained otherwise.

Finally, Plaintiff faults the ALJ for not crediting his statements about his carpal tunnel syndrome. (Pl.'s Mot. Summ. J. at 11.) In particular, Plaintiff testified to "[c]ramping and soreness,"

and "trouble reaching." (Tr. 35.) Plaintiff asserts that these statements were credible because Dr. Levin's Tinel's and Phalen's tests were positive. (Pl.'s Mot. Summ. J. at 11 (citing Tr. 183).) But Plaintiff again overlooks the findings of Drs. Friedman and Lazzara. In particular, Dr. Lazzara found that Plaintiff had no limitations in making a fist or picking up a coin or pencil, had unimpaired dexterity, intact grip strength, and had a full range of motion in the wrists, hands, and fingers. (Tr. 211, 215-16.) Dr. Friedman made similar findings. (Tr. 202, 204-05.) And, while acknowledging Dr. Levin's positive Tinel and Phalen's tests, Dr. Friedman nonetheless believed that Plaintiff "should be able to work eight hours/day without restriction." (Tr. 208.) Moreover, Dr. Levin never explained how Plaintiff's carpal tunnel syndrome translated to functional limitations, and Plaintiff has not explained how the ALJ's residual functional capacity limitations of "frequent" (i.e., no more than two-thirds of the workday) handling, fingering, and feeling with no reaching above shoulder level does not account for his carpal tunnel symptoms. (*See* Tr. 15.)

## V. CONCLUSION AND RECOMMENDATION

For the reasons set forth above, Plaintiff has not shown that the Administrative Law Judge committed reversible error in evaluating the opinion evidence of record or in deciding not to fully credit his testimony about his impairments. The Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 8) be DENIED, that Defendant's Motion for Summary Judgment (Dkt. 9) be GRANTED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be AFFIRMED.

## VI. FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1).

Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office. *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon this magistrate judge but this does not constitute filing. *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response. E.D. Mich. LR 72.1(d)(3), (4).

Dated: May 29, 2013

                                                s/Laurie J. Michelson
                                                LAURIE J. MICHELSON
                                                UNITED STATES MAGISTRATE JUDGE

---

CERTIFICATE OF SERVICE

Copies of this Report & Recommendation were served upon attorneys of record on May 29, 2013, by electronic and/or ordinary mail.

s/Barbara Radke
Deputy Clerk